<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

INGERSOLL-RAND COMPANY,

       Plaintiff,

    v.

BILL BARNETT, ALAIN MAIRE, RAMESH
PATEL, EUGENE SEROTINI, DAVID SHEMELD,
ALAN THORPE, JOHN DOES (heretofore
unidentified individuals) and JANE ROES (heretofore
unidentified individuals),

       Defendants,

SAMMY D. ANTOUN, BILL BARNETT, LARRY
BETCHE, DALE W. BEEBEE, BARRY E.
COTTRELL, ROBERT COUGHLIN, KEN
FAHRBACH, JAMES D. FOLEY, BRIAN
GALLAGHER, JOHN A. GEGUS, DAVE IOCCO,
DAVID LAMOREAUX, ED KNOEPFLE, RAMESH
PATEL, GARY F. PETERSON, DANTE E.
RAMELLA, LAWRENCE RICHARDS, EDI
BIOLCATI RINALDI, HANS RODBERG, MICHEL
RABUTEAU, EUGENE SEROTINI, DAVID
SHEMELD, JOHN SNYDER, ALAN THORPE,
CHRISTOPHER J. TRIFFITT, JOHN DOES 1-20,
and RICHARD ROES 1-20,

       Plaintiffs,

    v.

INGERSOLL-RAND COMPANY, a New Jersey
Corporation,

       Defendant.

CONSOLIDATED
CIVIL ACTION NO. 05-1636
(DRD)

<u>OPINION</u>

<u>Appearances</u>

Anthony Bartell, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056

     *Attorney for Ingersoll-Rand Company, Declaratory Judgment Plaintiff*


Jerry P. Sattin, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056

     *Attorney for Ingersoll-Rand Company, Declaratory Judgment Plaintiff and Counter Defendant*

Carey Francis, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056

     *Attorney for Ingersoll-Rand Company, <u>Antoun</u> Defendants*

James H. Forte, Esq.
SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311

     *Attorney for Declaratory Judgment Defendants and <u>Antoun</u> Plaintiffs*

Scott Steiner, Esq.
Kevin Kostyn, Esq.
STEINER & KOSTYN, LLP
2 William Street, Suite 302
White Plains, New York 10601

     *Of Counsel for Declaratory Judgment Defendants and <u>Antoun</u> Plaintiffs*

**DEBEVOISE, Senior District Judge**

In 2000, Ingersoll-Rand Company ("Ingersoll-Rand") sought to sell its affiliate, Dresser-Rand Company ("Dresser-Rand").  As part of its effort, it established the Ingersoll-Rand/Dresser-Rand Sale Incentive Program ("SIP") to reward certain Dresser-Rand employees upon Ingersoll-Rand's sale of Dresser-Rand by granting these employees Sales Value Units ("SVUs").  Ingersoll-Rand sold Dresser-Rand on October 31, 2004.  Following the sale, certain former Dresser-Rand employees demanded payment under the SIP.  Ingersoll-Rand, however, contended that they were not entitled to payment.

On February 10, 2005, Ingersoll-Rand filed a complaint in the New Jersey Superior Court against several former Dresser-Rand employees seeking a judgment that it bears no obligation to these former employees under the SIP.  See Ingersoll-Rand Company v. Bill Barnett, et al., Docket No. L-1075-05 ("Ingersoll-Rand Action").  Subsequently, Ingersoll-Rand added additional former employee defendants.  Defendants then removed the Ingersoll-Rand Action to this Court.

On June 1, 2005, one current Dresser-Rand employee and several former Dresser-Rand employees, including five defendants in the Ingersoll-Rand Action, filed an action against Ingersoll-Rand in this Court, seeking payment under the SIP for the 2004 sale of Dresser-Rand.  See Sammy D. Antoun et al. v. Ingersoll-Rand Co., Civil Action No. 05-2834 (HAA) ("Antoun Action").  The complaint was amended from time to time to add additional former Dresser-Rand employees as plaintiffs.  The Ingersoll-Rand Action and the Antoun Action have been consolidated.

Ingersoll-Rand moved for partial summary judgment dismissing the claims of nine former Dresser-Rand employees who executed severance agreements that contained broad release language ("Antoun plaintiffs").

3

In response, the <u>Antoun</u> plaintiffs moved for partial summary judgment to strike the Second and Third Separate Defenses of Ingersoll-Rand and to declare that the releases in the severance agreements of <u>Antoun</u> plaintiffs Sammy Antoun, Dale Beebee, Barry Cottrell, Ken Fahrbach, Brian Gallagher, John Gegus, Dave Iocco, Gary Peterson and John Snyder do not bar the claims asserted in the <u>Antoun</u> Complaint. The Second Separate Defense states that "[p]laintiffs' claims are barred by the releases signed by plaintiffs upon termination of their employment with Dresser-Rand . . . ." The third Separate Defense provides that "[p]laintiffs' claims are barred by the doctrine of accord and satisfaction."

## I.  BACKGROUND

### A.  The SIP

Before February 2000, Dresser-Rand was a joint venture owned forty-nine percent (49%) by Ingersoll-Rand and fifty-one percent (51%) by Dresser Inc. In August 1999, Ingersoll-Rand announced that it intended to sell its 49% interest to Dresser Inc. Consistent with its rights under the joint venture agreement, Dresser Inc. elected not to purchase Ingersoll-Rand's interest, but, instead, to sell its 51% interest to Ingersoll-Rand. In February 2000, Ingersoll-Rand purchased Dresser Inc.'s 51% interest for approximately $543 million, at which time Dresser-Rand became a wholly-owned subsidiary of Ingersoll-Rand.

Thereafter, Ingersoll-Rand desired to divest itself of its interest in Dresser-Rand. To further this purpose and to achieve a desirable sale price for Dresser-Rand, Ingersoll-Rand adopted the SIP. It sent a copy of the plan and a cover letter to the key employees who were selected to participate in the program. Each of the nine plaintiffs received a notice, dated January 23, 2001 and marked "confidential," from B.D. Jellison announcing the "Dresser-Rand Sale Incentive Program." By way

4

of example, the letter to Mr. Antoun read:

> Congratulations on helping build the second half of 2000 into a strong foundation for the future of Dresser-Rand.  The continued turnaround of the business and the execution of focused initiatives in developing new opportunities will make the business more attractive to a buyer.  This in turn means a brighter and more secure future for our associates.
>
> We have developed an incentive plan for you, which is designed to reward your contribution towards improving Dresser-Rand's earnings now and in years to come. The plan rewards you for your efforts in achieving the best sales price for the Dresser-Rand Company.
>
> I am pleased to present you with 50000 Dresser-Rand Sale Value Units (SVU). These Sale Value Units will be converted into cash and a lump sum paid to you within 90 days of the date of sale of Dresser-Rand Company.  The value of an SVU is directly related to the sale price of Dresser-Rand Company.  The higher the sale price, the higher the value of your SVU.  A copy of the plan summary is enclosed.

[sic].

The SIP set forth its purpose "to reward key employees for their contributions toward maximizing [earnings] and consequently, a desirable sale price for Dresser-Rand Company."  It was noted that "[t]his plan is in lieu of any grant from a Stock Appreciation Right (SAR) Plan and/or Stock Option program for the years 2001, 2002 and 2003."

The plan also included a section entitled "<u>EFFECTIVE DATE</u>."  It provided that "[t]he plan is effective September 1  2000 [sic] and will remain in effect until Dresser-Rand Company is sold." The SIP contained provisions for determining the value of an SVU and provided that "[a]ny award under this plan will be paid no later than 90 days following the closing date of the sale of Dresser-Rand Company."

The termination provision reads:

An employee who voluntarily terminates or is involuntarily terminated by the

Company for any reason before the closing date of the sale, with the sole exceptions of death, disability, or retirement shall not receive or be entitled to any award from this plan.  For those employees who leave the Company for the reason of death, disability or retirement will receive a pro-rated award based on the time they were actively employed during the period from the effective date of this plan to December 31, 2002.  Any payment due will be made within 90 days from December 31 2002. [sic].

When Dresser-Rand was not sold by December 31, 2002, Ingersoll-Rand abandoned its efforts to sell Dresser-Rand for a time and then initiated a new effort to sell in 2004.  In connection with its new sale efforts, Ingersoll-Rand devised a new sale reward plan (the "2004 Plan").  On October 31, 2004, Ingersoll-Rand sold Dresser-Rand.

The Antoun plaintiffs assert that as a result of the sale, they are entitled to payment of their SVUs under the SIP.  Ingersoll-Rand denies that they are entitled to such payments because the SIP terminated on December 31, 2002 and, further, the nine Antoun plaintiffs released their rights under the SIP in their individual severance agreements.

## B.  The Severance Agreements

Each of the nine plaintiffs who were former employees executed severance agreements.

### 1.     Mr. Antoun's Agreement:[1]

According to the agreement executed by and for Mr. Antoun, his "active work activities with the Company [ceased] effective July 15, 2003."  The terms under which Mr. Antoun retired are specified in the letter signed by Vincent R. Volpe, President, Dresser-Rand, dated July 15, 2003, which provides, in paragraph 4,  that "[a]ll other vested employee and executive Company benefits

---

[1]In 1976, plaintiff Sammy D. Antoun commenced employment with Ingersoll-Rand as a Service Supervisor.  Over the course of his employment he was promoted several times.  For nearly three years prior to his early retirement date, July 15, 2003, he worked for Dresser-Rand as Executive Vice President of the Europe Served Areas Region.

will be paid according to the specific plan or practice . . . .  If there is a conflict between any

statement in this letter and a plan document the plan document will control."  Also, the July 15

agreement at paragraph 13 contains a release that provides:

> In consideration for the benefits provided under this Agreement including but not limited to those provided in paragraphs (3) and (8), you hereby irrevocably and unconditionally release and forever discharge the Company, its parents, affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claim [sic], and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the Effective Date of this agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or the termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et seq.) [sic].

> In addition, the agreement at paragraph 14 provided that

> The parties understand the word "claims" to include all actions, claims, and grievances, whether actual or potential, known or unknown, and specifically but not exclusively all claims arising out of your employment with the Company and termination.  All such claims (including related attorney's fees and costs) are forever barred by this Agreement and without regard to whether those claims are based on any alleged breach of duty arising in contract or tort [sic] any alleged unlawful act, including, without limitation, age discrimination or any other claim or cause of action and regardless of the forum in which it might be brought.

**2.    Mr. Beebee's Agreement:**[2]

According to the agreement executed by and for Mr. Beebee, his "active employment with

---

[2]Plaintiff Dale Beebee worked for Dresser-Rand, and its predecessor(s), at the Wellsville, New York location for almost 30 years until electing early retirement on July 31, 2004.  Having been promoted a number of times during his tenure with the company, Mr. Beebee's final position was Vice President and General Manager of the Wellsville facility.

the Company [continued] through January 31, 2003."[3]  The terms under which Mr. Beebee retired are specified in the letter signed by A.L.C. Nightingale, Director, Human Resources, Olean and Wellsville Operations, Dresser-Rand, dated January 23, 2003, which provides, in paragraph 6,  that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practice. $142,920 is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit."  The letter also contains at paragraph 7.d the following release:

> You hereby irrevocably and unconditionally release and forever discharge Dresser-Rand Company, its parents and their affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you have at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.).

Beebee's agreement at paragraph 7.e also contains essentially the same definition  of "claims" as provided  in Antoun's agreement at paragraph 14.

> **3.        Mr. Cottrell's Agreement**:[4]

---

[3]According to the severance agreement, although Mr. Beebee's last day of active service was January 31, 2003, he was continued on an approved unpaid personal leave until the date of his official termination of employment, July 31, 2004.

[4]In 1968, plaintiff Barry E. Cottrell commenced employment as a clerk with Boyles Industries Limited, which at the time was part of Dresser Industries, Inc.  He continued to work for Dresser Industries and Dresser-Rand and was promoted numerous times.  For approximately five years prior to his retirement on September 30, 2001,  Mr. Cottrell held the position of Vice President of Finance,

According to the agreement executed by and for Mr. Cottrell, although his "termination [was] effective September 30, 2001," his "last day of work [was] September 21, 2001." The terms under which Mr. Cottrell retired are specified in the letter signed by J.B. Gallagher, Vice President, Human Resources, Dresser-Rand, dated September 19, 2001, which provides in Section I.H that "[i]f there is a payment from the SVU plan, it will be made in accordance with the rules of the plan." Section II, entitled "Release of Claims," reads as follows:

A. While it is our expectation that you do not have any claims against the Company, in an effort to be certain that any actual or potential claims that you have or may have are resolved amicably forthwith, we shall extend to you the benefits as set forth in this letter if, and only if, you agree to release the Company from any and all actual and potential claims as provided in this Section II and you comply with the terms and conditions of this letter including the satisfactory performance of your work assignments through your last day of work as set forth in Section I. You are encouraged to seek the advice of an attorney prior to accepting the provisions of this letter.

B. . . .

C. In consideration of the payments to be made to you and other benefits to be provided to you as set forth in this letter, you hereby irrevocably and unconditionally release the Company and the successors, assigns, employees, officers and directors of the Company from and against any and all claims, liabilities, demands and causes of action, known or unknown, suspected or unsuspected, that you may have by reason of any action, statement, representation, omission, transaction or event occurring up to and including your termination date resulting from or in any way connected with your employment or termination of employment by the Company, including, but not limited to, any claims arising under the Age Discrimination in Employment Act, Americans with Disabilities Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, and any other federal, state or local statutes, ordinances and regulations or common law.

In addition, a second, separate "Release of Claims" was executed on the same date which

---

reporting to Vincent Volpe, President of Dresser-Rand.

reads in full:

> You hereby irrevocably and unconditionally release and forever discharge Ingersoll-Rand Company, its affiliates and subsidiaries (including, without limitation, (company name), each and all of the officers, agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with **the Company** or the termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621, et. seq.).

> The parties understand the word "claims" to include all actions, claims, and grievances, whether actual or potential, known or unknown, and specifically but not exclusively all claims arising out of your employment with the **Company** and termination.  All such claims (including related attorney's fees and costs) are forever barred by this Agreement and without regard to whether those claims are based on any alleged breach of duty arising in contract or tort; any alleged unlawful act, including, without limitation, age discrimination; any other claim or cause of action; and regardless of the forum in which it might be brought.

> Please acknowledge your agreement to the terms set forth above by signing and dating below where indicated.  You are agreeing to this release of your own free will after you have had the opportunity to consult an attorney and have been given adequate time to consider the agreement and this release.

There was, however, a previous severance agreement, signed by V.R. Volpe, President, Dresser-Rand Company, on November 8, 2000 and signed by Mr. Cottrell and witnessed by J. Brian Gallagher on January 31, 2001, which reads in part:

> 5.      Annual Bonus
> During the term of this agreement, you are operating under the Annual bonus program established by D-R, and your D-R incentive compensation will be determined based on this program.  When the sale of D-R occurs, an incentive compensation amount will be determined using the program, pro-rated for the length of year D-R was owned by Ingersoll-Rand Company.  This pro-rated incentive compensation will be paid to you either by D-R or the new owner, depending on the

10

sales agreement.  Any incentive program after the sale date will be based on a design by the new owner and will be the new owner's financial responsibility.

**4.      Mr. Fahrbach's Agreement:**[5]

Upon volunteering for early retirement from Dresser-Rand, an agreement was executed by and for Mr. Fahrbach, which provided that his "active employment with the Company [would] continue through September 30, 2003" and that he would "continue to be considered an employee for compensation and benefit purposes to September 30, 2003 on which date [his] employment [would] terminate."   The terms under which Mr. Fahrbach retired are specified in the letter signed by Robert H. Haffner, Manager, Human Resources, Dresser-Rand, Wellsville Operations, dated September 2, 2003, which provides, in paragraph 5, Other Benefits,  that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practice. $71,557 is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit."   The agreement also contains, at paragraph 8, the following release:

> You hereby irrevocably and unconditionally release and forever discharge Dresser-Rand, its parents, their affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.  It is expressly understood by you that

_____

[5]Plaintiff Ken Fahrbach commenced working for the Whiton Division of Terry Steam Turbine Company in 1972.  In 1974, Terry Steam Turbine Company became a subsidiary of Ingersoll-Rand.  Mr. Fahrbach continued to work for Ingersoll-Rand and Dresser-Rand, or one of their predecessors or affiliates, until his retirement on September 30, 2003.  About three years prior to his retirement, Mr. Fahrbach was promoted by Dresser-Rand to the position of  Director, Government Business Unit, which he held until his retirement

among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.). [sic].

Fahrbach's agreement at paragraph 9 also contains essentially the same definition of "claims" as provided in Antoun's agreement at paragraph 14.

**5.      Mr. Gallagher's Agreement:**[6]

According to the agreement executed by and for Mr. Gallagher, his "active work activities with the Company [ceased] effective April 30th, 2003 and [his] employment with Dresser-Rand changed to inactive status ("Effective Date")." [sic]   The terms under which Mr. Gallagher retired are specified in the letter signed by Vincent R. Volpe, President, Dresser-Rand, dated April 1, 2003, which provides in paragraph 3 that "[a]ll other vested employee and executive Company benefits will be paid according to the specific plan or practice."   The agreement also contains, at paragraph 15, the following release:

> In consideration for the foregoing separation payment mentioned above, you agree not to file against, and you hereby irrevocably and unconditionally release and forever discharge the Company, its parents, affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claim, [sic] and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the Effective Date of this agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.   It is

---

[6]In 1980, plaintiff Brian Gallagher began working in the Human Resources department of Magcobar Group, a division of Dresser Industries, Inc.  He was promoted several times during the time he worked for Dresser Industries and Dresser-Rand.  In 1997 he was promoted to the position of Executive Vice President - Administration for Dresser-Rand, the position he held until his retirement on December 6, 2004.

expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.). [sic].

Gallagher's agreement at paragraph 9 also contains essentially the same definition of "claims" as provided in Antoun's agreement at paragraph 14.

   **6.    Mr. Gegus' Agreement:**[7]

According to the agreement executed by and for Mr. Gegus, his "active employment with the Company [continued] through January 31, 2004 and [he continued] to be considered an employee for compensation and benefit purposes to January 31, 2004 on which date [his] employment [terminated]." The terms under which Mr. Gegus retired are specified in the letter signed by David A. Stonebarger, Director, Human Resources, Dresser-Rand, Business Solutions, dated December 29, 2003, which provides in paragraph 9, <u>Other Benefits</u>, that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practice. $75,000 is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit." The agreement also contains, at paragraph 10.c, the following release:

> You hereby irrevocably and unconditionally release and forever discharge Dresser-Rand Company, its parents and their affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to

--------------------------------------------------

[7]Also in 1980, plaintiff John Gegus commenced working for Turbodyne Steam Turbines, which was acquired by Dresser Industries, Inc. in 1984. During the course of his employment with Dresser Industries, Inc. and Dresser-Rand, Mr. Gegus was promoted numerous times. Although in 2001 he resigned as President of Multi-Phase Power Technology, LLC, a part of Dresser-Rand, he accepted the position of Director of Business Solutions with Dresser-Rand in April 2002, the position held until his retirement on January 31, 2004.

have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.). [sic].

Gegus' agreement at paragraph 9 also contains essentially the same definition of "claims" as provided  in Antoun's agreement at paragraph 14.

### 7.    Mr. Iocco's Agreement:[8]

Upon volunteering for early retirement from Dresser-Rand, an agreement was executed by and for Mr. Iocco, which provided that his "active employment with the Company [would]  continue through 7/18/2003," and that he would "continue to be considered an employee for compensation and benefit purposes to 7/18/2003 on which date [his] employment [would] terminate."   The terms under which Mr. Iocco retired are specified in the letter signed by Ted Meadows, Manager, Human Resources, Dresser-Rand, dated July 18, 2003, which provides, in paragraph 5, <u>Other Benefits</u>,  that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practice . . . .  $77,889.23 is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit."  The agreement also contains, at paragraph 8, the following release:

You hereby irrevocably and unconditionally release and forever discharge Dresser-Rand, its parents, their affiliates and subsidiaries, each and all of their officers,

---

[8]In 1964, plaintiff Dave Iocco commenced employment with Ingersoll-Rand and he continued to work for Ingersoll-Rand and Dresser-Rand until his retirement on July 18, 2003. During his nearly forty year career, he was promoted a number of times.  About eight years prior to his retirement, he was promoted to Vice President, Gas Engine Business Unit.  The title of that position was changed to Director, Worldwide Sourcing Reciprocating Products, then to Manager, Engineered Replacement Solutions, and finally to Manager, Engineered Replacement Services.

agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or the retirement therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.). [sic].

His agreement at paragraph 9 also contains essentially the same definition of  "claims" as provided  in Antoun's agreement at paragraph 14.

**8.      Mr. Peterson's Agreement:[9]**

According to the agreement executed by and for Mr. Peterson, his "active employment with the Company [continued] through March 31, 2003 and [he continued] to be considered an employee for compensation and benefit purposes to March 31, 2003 on which date [his] employment [terminated].  The terms under which Mr. Peterson retired are specified in the letter signed by David A. Stonebarger, Director, Human Resources, The Americas Region, Dresser-Rand, dated March 10, 2003, which provides, in paragraph 8, <u>Other Benefits</u>,  that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practice. $93,384.80  is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit."  The letter also contains, at paragraph 9.c, the following release:

You hereby irrevocably and unconditionally release and forever discharge Dresser-

---

[9]Plaintiff Gary Peterson began in 1963 as a trainee for Ingersoll-Rand and, in the forty years that he worked for Ingersoll-Rand and Dresser-Rand, he was promoted several times prior to his retirement from Dresser-Rand on March 31, 2003.  The final position that he held was that of Manager of Project Development.

Rand Company, its parents and their affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns [sic] all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.).  [sic].

In addition, the agreement at paragraph 9 contains substantially the same definition of "claims" that is contained in Antoun's agreement at paragraph 14.

**9.    Mr. Snyder's Agreement:**[10]

According to the agreement executed by and for Mr. Snyder, his "active work activities with the Company [ceased] effective March 31, 2004 (effective date)."  The terms under which Mr. Snyder retired are specified in the letter signed by Vincent R. Volpe, President, Dresser-Rand, dated March 3, 2004, which provides, in paragraph 3,  that "[a]ll other vested employee and executive Company benefits will be paid according to the specific plan or practice."  The letter also contains, at paragraph 9, the following release:

In consideration for the foregoing separation payment mentioned above, you agree not to file against, and you hereby irrevocably and unconditionally release and forever discharge the Company, its parents, affiliates and subsidiaries, each and all

---

[10]In 1975, plaintiff John Snyder commenced employment with Dresser Industries' Harbison-Walker Refractories Group as the Industrial Relations representative and, in two years, was promoted to the group's Personnel Manager.  He was promoted several times over the course of his thirty-year career with Dresser Industries and Dresser-Rand.  In 2001, he was promoted to the position of Vice President, Human Resources, responsible for all employee relations and personnel matters for Dresser-Rand.  He held this position until his retirement on March 31, 2004.

of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim" or "claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the Effective date of this Agreement, including, without limitation, any and all claims related or in any manner incidental to your employment with the Company or termination therefrom.  It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age discrimination [sic] in Employment Act of 1967 (29 U.S.C. § 621, et. seq.). [sic].

In addition, his agreement at paragraph 10 provides essentially the same definition of "claims" that appears in Antoun's agreement at paragraph 14.

**C.   Written Communications Concerning Payment of the SVUs**

**1.      To and From Mr. Antoun**

On April 4, 2003, prior to his retirement on July 15, 2003, e-mail correspondence was sent between Mr. Antoun and Vince Volpe, President of Dresser-Rand, which reads in part:

> Antoun to Volpe:
> THE FINAL DOCUMENT SHOULD CLEARLY ADDRESS AND CONTAIN THE FOLLOWING:
>
> . . .
>
>  - EXCHANGE OF YEAR 2000 SVU'S (SALES VALUE UNITS) RECEIVED IN 2000 IN LIEU OF STOCK OPTIONS WITH 2003 EQUAL NUMBER OF STOCK OPTIONS.

> Volpe to Antoun:
> No one in D-R is getting this -why should you.the only way they are good is if we are sold, which clearly is not happenning in this time frame-forget it [sic].

> Antoun to Volpe:
> I THINK THE ABOVE IS STRAIGHTFORWARD REFLECTING OUR AGREEMENT ON THE MAJOR ISSUES.  I HOPE IT WILL MEET WITH YOU APPROVAL SO WE CAN FORGE AHEAD.  I ALSO HOPE THAT

I DIDN'T FORGET ANY IMPORTANT ISSUES.
[sic].

E-mails were exchanged again on May 1, 2003 between Antoun and Volpe:

Antoun to Volpe:
1)- SVU's
THE COMPANY MIGHT NOT HAVE BEEN SOLD, BUT I SOLD
MY DIVISION LOCK STOCK AND BARREL??  THIS IS A
MAJOR ISSUE FOR ME AND I HAVE TO DISCUSS FURTHER
WITH MY ATTORNEY ABOUT WHAT THE COMPANY CAN
AND CAN'T DO (CANCELING JUST SHORTLY BEFORE A
POTENTIAL SALE AS EXAMPLE).  I UNDERSTAND WHAT
YOU ARE SAYING ABOUT THESE SVU ARE EVER GREEN
ETC HOWEVER, I'M SURE THAT EXPOSURE SIMILAR TO
STOCK OPTIONS.  MY LAWYER WANTS TO REVIEW THIS
FILING FORM 5500 OR SOMETHING LIKE THAT.  HE TELLS
ME IT'S NOT CONFIDENTIAL, IT'S PUBLIC KNOWLEDGE.
AS FAR AS THE AGREEMENT ITSELF, I'VE NO ACCESS TO
THE IT, IT'S IN HOUSTON IN STORAGE.  I'VE TO HAVE
SOME PROTECTION HERE. (SA)
[sic].

Volpe to Antoun:
There is nothing to pay here since the Company has not been sold.
You are being treated the same as everyone else on the plan-no payout
prior to Sale.
[sic].

Further response by e-mail was sent on May 2, 2003 from Volpe to Antoun:
Another example-SVUs.You are not going to get paid these.Nor is anyone
else unless we get sold first.The SVU's did not apply to Broken Arrow in
the first place so your argument doesn't even begin to hold water.Now,if
you want your lawyer to check on some public documents no problem-but
that won't change the Company position.
[sic].

Antoun again raised the issue in e-mail to Volpe on May 6, 2003.

Antoun to Volpe:
IT SEEMS THAT THE ADVANCE PAYMENTS AND SVU ARE THE
COMPANY MAJOR ISSUES.   IN MY USUAL COOPERATIVE

18

SPRINT, I WILL AGREE TO THE FOLLOWING:

. . .

-ITEM 1 FROM BELOW (SVU'S).

IN THE CONTRACT WE WILL ADD WHAT YOU JUST TOLD ME
OVER THE PHONE, THEY ARE EVER GREEN, I WILL BE
TREATED LIKE ALL OTHER SVU HOLDERS, ETC ETC   AND BE
PAID IF AND WHEN THE COMPANY IS SOLD.  LIKE THE
CONSULTING AGREEMENT, I ASSUME THAT IF I DIE BEFORE
THE COMPANY IS SOLD, THE CO. LIABILITY SHALL PASS ON
TO MY SPOUSE.  FAIR
[sic].

Volpe to Antoun:
The documents are going to be silent on SVU's.What applies to all
others in the program applies to you.
[sic].

Antoun to Volpe:
THAT'S A VERY LEGAL ISSUE.  WHAT YOU ARE SAYING IS
FINE, I WOULD LIKE TO MAKE SURE THAT WHAT APPLIES
TO CURRENT EMPLOYEES IN THE FUTURE APPLIES TO
RETIRED EMPLOYEES AND THAT THERE IS NO CANCELLATION
DATE.  THE ONLY WAY FOR MY ATTORNEY TO CHECK THAT
IS THE ACTUAL DOCUMENT WHICH I HAVE IN STORAGE
AND I-R COMPANY FILING.  CAN YOU PLEASE HAVE SNYDER
COURIER BOTH TO THE FOLLOWING ADDRESS: . . . .
[sic].

Volpe to Antoun:
We'll send you a copy of your stuff,since it is in storage.
[sic].

Antoun again e-mailed Volpe on May 30, 2003.

Antoun to Volpe:
. . .

2- THE ISSUE OF SVU, IS A MAJOR ISSUE WITH MY ATTORNEY,
SPECIFICALLY IN THE ABSENCE OF I-R FILLING OF THIS 5500
FORM.  HE IS INSISTING THAT IT SHOULD BE MENTIONED IN

19

> THE AGREEMENT AND I KNOW THAT YOU DON'T WANT TO
> DO THAT.  AS A ALTERNATIVE, HE THINKS IT'S REASONABLE
> TO ASK FOR A COMFORT LETTER INDICATING THAT THE PLAN
> WILL REMAIN IN EFFECT AND ANY FUTURE SOLUTION
> APPLICABLE TO EMPLOYEES WILL APPLY TO VESTED
> RETIREES LIKE MYSELF.  I THINK IT'S A GOOD SOLUTION.
> [sic].

Volpe responded on May 31, 2003:

> Sammy I'll be talking with Chris asap and get back to you on the items
> you have raised.

**2.     To and From Mr. Fahrbach**

Between September 24 and September 29, 2003, following the execution of his agreement

but prior to his retirement date of September 30, 2003, e-mail correspondence was sent between Mr.

Fahrbach,  Robert Haffner, Manager, Human Resources, Dresser-Rand, Wellsville Operations, and

Mr. Haffner's supervisor, Adam Nightingale, which reads in part:

> Fahrbach to Haffner on September 24:
> Reference Connie Lewis letter of September 4 2003 and your letter of
> September 2 2003 with attached "Certification".
>
> The following are the clarifications, as I understand them.
>
> . . .
>
> Para #3 . . For the purposes of Aims for the year 2003, svu's and past stock
> option awards I am being classified as retiring.
>
> . . .
>
> Please confirm by return and I will execute the "Certification"
> [sic].

> Haffner to Fahrbach (with a copy to Nightingale) on September 24:
> Ken,
> I am in agreement with your understandings/clarifications as you state them
> below.  By copy to Adam, do you agree?

20

Nightingale to Haffner and Fahrbach on September 24:
>  I don't understand the comment on paragraph 6.

>  . . . [e-mails concerning internet message board postings are omitted].

Fahrbach to Nightingale and Haffner on September 25:
>  Are we in agreement   ??
>  [sic].

Nightingale to Fahrbach and Haffner on September 28:
>  We are all in agreement

>  Ken, go for execution!
>  [sic].

**3.     From Mr. Gallagher**

Following the decision not to go forward with the sale of Dresser-Rand and prior to signing

his severance agreement dated April 1, 2003, Mr. Gallagher expressed his concern in a letter dated

October 25, 2002 to Mr. Volpe, President, Dresser-Rand,  that Dresser-Rand was defaulting on his

November 15, 2000 employment agreement.  In part, the letter reads:

>  I am writing to request that Dresser-Rand place me in the position
>  that I would have been in had D-R followed through on the promises
>  made to me.  I am very concerned that the company is reversing its
>  long-standing position on the sale of Dresser-Rand, contrary to
>  promises made to me.  I am also very concerned that the company
>  does not presently intend to honor its promises and commitments to
>  me in this matter.

>  . . .

>  John Turpin has now made it clear, however, that it is his intention
>  not to go forward with the sale of Dresser-Rand, which is a reversal
>  of position and contrary to the assurances I have received.  I accept
>  that Ingersoll-Rand has the right to unilaterally decide whether or not
>  to sell D-R.  However, this unilateral decision is contrary to promises
>  made to me, and Ingersoll-Rand has an obligation to put me in a
>  position that I would have been in had it fulfilled its obligation.  The
>  decision to retain Dresser-Rand is in fact tantamount, under these

circumstances, to a decision by Ingersoll-Rand to substitute itself for a third-party purchaser, at the cost of my rights.

. . .

I am requesting to be placed in the position I would have been in had D-R fulfilled its promises to me.  Specifically I request payment of severance as calculated in the agreement, payment of SVU's based on a mutually agreeable third party evaluation of the company . . . and any other benefits due from the employment agreement.

I am requesting a copy of the Ingersoll-Rand SVU Plan's Summary Plan Description, Plan document and 5500(s).  I realize that you may charge me reasonable reproduction costs.

It would be up to Dresser-Rand to decide whether I would continue employment after the payment of the above, although I enjoy my job and would like to continue to work for D-R.  I understand that you may find that inconsistent with the payments requested.

As I know that Ingersoll-Rand has been anticipating challenges as a result of their change in intent to sell Dresser-Rand, I would assume it has formulated a position relative to my request.  I would, therefore, expect a response to my concerns within seven days of receipt of this letter.  Please call if that is impractical.

. . . I believe that you agree with my position, but I understand that you, too, have a boss.

**4.      To and From Mr. Snyder**

On November 29, 2004, following his retirement on March 31, 2004, e-mail correspondence

was sent between Mr. Snyder and Vince Volpe, President of Dresser-Rand, which reads:

Snyder to Volpe:
VINCE, I am delighted to see the sale of D-R has been consummated.  I suspect you have simply traded one set of challenges for another, but you are up to it.

I do have a few questions related to the sale and the SVU plan, as it pertains to retirees:

1. Net Price.  What price will be used for SVU's?  The publicized sales price was

22

$1.2 billion (below).  What was the **net sales price** (net of transaction fees and liabilities)?  Are advance asset sales being considered (990 line, Seneca Street, etc.)?  How much value do the other pieces add?

2.  Pro-Rata Formula.  Under the document, SVU's were granted to key people **September 1, 2000** and were in effect until Dresser-Rand Company is sold.  I retired on **April 1, 2004**.  The sale was effective **November 1, 2004**.  What formula will be used for the pro-rata calculation?  Is it as simple as 43 months/50 months?

3.  Timing.  Will you be able to meet the timing in terms of the plan document which calls for payments **within 90 days**?  Will the payments be in 2004 or 2005?  When the checks are cut, please use my address of 675 Main Street, Olean, NY 14760 for mailing the check.  Please advise if you need any other info to mail the check.

JOHN
[sic].

Volpe to Snyder:
Hi John, You are right about trading sets of challenges.

John the SVU program, which,as you know, was an IR program, was cancelled by IR for all participants-active as well as retirees.  Beth will call you next week and go through the longer version of the story as a matter of courtesy, but in the end it was an IR program that they administered.   Sorry to not have better news for you on this.

Regards,

Vince
 [sic].

**5.      To Mr. Foley**

The following e-mails concerning the SVUs were sent between July 22, 2004 and September

23, 2004:

July 22 from Michael T. Reddy to David A. Stonebarger:
        Subject: SVU's or SUV's

        dave are these still valid?  What is the official word?
        [sic].

July 22 from Michael T. Reddy to David A. Stonebarger:

23

Subject: SVUs or SUV's

just so there is clarity. . . .the SVU's are still good?  So maybe we can
retire or something like that. . . . .
[sic].

July 22 from David A. Stonebarger to Michael T. Reddy:
Subject: SVU's or SUV's

Only if we get sold.  HRD
[sic].

On August 12, 2004, Reddy sent the above e-mails to Fred J. Tanneberger who, on
September 23, 2004, sent them to <u>Antoun</u> plaintiff James P. Foley.

**D.  The Motions for Summary Judgment**

**1.  Ingersoll-Rand's Motion for Summary Judgment**

Ingersoll-Rand moves for partial summary judgment to dismiss the claims of certain <u>Antoun</u>
plaintiffs, the nine former Dresser-Rand employees who executed severance agreements to effect
their retirements.  Ingersoll-Rand contends, in the first instance, that there was no plan in effect when
the <u>Antoun</u> plaintiffs retired because, when the sale of Dresser-Rand did not occur as anticipated,
the SIP expired on December 31, 2002.  Pointing to the line in the SIP document which reads that
"those employees who leave the Company for the reason of death, disability or retirement will
receive a pro-rated award based on the time they were actively employed during the period from the
effective date of this plan to December 31, 2002," Ingersoll-Rand asserts that this expressly
conditioned payment of SVUs under the SIP upon the sale of Dresser-Rand by December 31, 2002.
Further, Ingersoll-Rand contends that all the SIP beneficiaries knew that active efforts to sell
Dresser-Rand ceased before December 31, 2002.

In the alternative, Ingersoll-Rand contends that, even if there was a plan in effect beyond

December 31, 2002, by signing the broad releases contained in their severance agreements and in consideration of "extremely generous severance packages," the <u>Antoun</u> plaintiffs released Ingersoll-Rand from any obligation to pay under the SIP, while other claimants negotiated severance agreements, which specifically included reference to the SIP.  Ingersoll-Rand argues that, although the severance agreements of the <u>Antoun</u> plaintiffs may vary slightly based upon whether the agreement was prepared by Ingersoll-Rand or by Dresser-Rand, all the agreements release Ingersoll-Rand, Dresser-Rand, its parents, affiliates and subsidiaries from

> . . . any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected . . . which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement . . .

> The parties understand the word "claims" to include all actions, claims, and grievances, whether actual or potential, known or unknown, and specifically but not exclusively all claims arising out of your employment with the Company and termination.  All such claims (including related attorney's fees and costs) are forever barred . . .

Ingersoll-Rand contends that the severance payments of the <u>Antoun</u> plaintiffs were unique to the individual and superior to the standard company severance benefits in that they included consideration of all incentive plans, including the SIP.  Ingersoll-Rand asserts that the language of the severance agreements is unambiguous and that it "fully supercede[s] any and all agreements or understandings, written or oral" between these employees and the company.  Ingersoll-Rand asserts that each of the nine were key employees and well-educated, savvy business men who, despite understanding the importance of, and the effect of, the releases, knowingly and voluntarily released their claims to payments under the SIP.

## 2.  The <u>Antoun</u> Plaintiffs' Motion for Summary Judgment

Opposing Ingersoll-Rand's motion for summary judgment, the <u>Antoun</u> plaintiffs contend that they were not aware that the SIP was defunct as of December 31, 2002,  and Ingersoll-Rand never notified them that this was the case until August 26, 2004, the day after Dresser-Rand was sold, when they were informed that they would not be paid for their SVUs.  Pointing to the "Effective Date" language of the 2000 SIP, which states that the plan is in effect until DR is sold, the <u>Antoun</u> plaintiffs claim that their SVUs became due and payable within ninety (90) days after the sale closed on October 29, 2004.  The <u>Antoun</u> plaintiffs contend that they gave up their grants from the stock appreciation right program and stock option program in exchange for the SVUs that were awarded in January 2001 for the years 2001, 2002, and 2003.

In addition, the <u>Antoun</u> plaintiffs seek partial summary judgment to strike Ingersoll-Rand's Second[11] and Third[12] Separate Defenses because 1) Ingersoll-Rand awarded each of the <u>Antoun</u> plaintiffs SVUs under the SIP; 2) the releases do not apply to this action because this action had not accrued as of the Effective Date of their severance agreements; and, 3) because Dresser-Rand was yet to be sold, there were no claims to release as of the Effective Date of their severance agreements.

## II.  DISCUSSION

**The Contract Language Standard**

First at issue here is the interpretation and application of the year 2000 document entitled, "Ingersoll-Rand Company Dresser-Rand Sale Incentive Plan."  Ingersoll-Rand claims that the SVUs

---

[11]"Plaintiffs' claims are barred by the releases signed by the plaintiffs upon the termination of their employment with Dresser-Rand . . . ."

[12]"Plaintiffs' claims are barred by the doctrine of accord and satisfaction."

expired on December 31, 2002, well before the actual sale of Dresser-Rand in 2004, because the SIP provides that "[a]ny payment due will be made within 90 days from December 31 2002 [sic]." The Antoun plaintiffs claim that the SVUs remained in effect until Dresser-Rand was sold because the SIP provides that "[t]he Plan is effective September 1 2000 [sic] and will remain in effect until Dresser-Rand Company is sold."

Whether terms of a plan document are ambiguous is a question of law. A term is "ambiguous if it is subject to reasonable alternative interpretations." See Taylor v. Cont'l Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir.1991); see also Mellon Bank, N.A. v. Aetna Bus. Credit Inc., 619 F.2d 1001, 1011 (3d Cir.1980). In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of the document because "[t]he written terms of the plan documents control . . . ." See In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 902 (3d Cir.1995). If the plain language of the document is clear, courts must not look to other evidence. In re Unisys Corp. Long-Term Disability Plan ERISA Litig., 97 F.3d 710, 715 (3d Cir.1996). Where the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve ambiguities in the plan document, but "it is inappropriate to [do so] when no ambiguity exists." Epright v. Envtl. Res. Mgmt., Inc. Health and Welfare Plan, 81 F.3d 335, 339 (3d Cir.1996). Also, "[w]hen interpreting contracts, [courts] are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible." See CTF Hotel Holdings, Inc. v. Marriot Int'l, Inc., 381 F.3d 131 (3d Cir. 2004) (citation omitted).

Here, the Court finds Ingersoll-Rand's reliance on the inclusion of the December 31, 2002 date in the section entitled "Termination" is misplaced. Clearly, the section refers not to the

termination of the SIP, but to the termination of employment of an employee covered by the SIP. It describes "[a]n employee who voluntarily terminates or is involuntary terminated . . . before the closing date of the sale . . . shall not receive or be entitled to any award . . . ." It then carves out exceptions for "employees who leave the Company for the reason of death, disability or retirement [to] receive a pro-rated award based on the time they were actively employed . . . from the effective date of this plan to December 31, 2002," specifying that "[a]ny payment due will be made within 90 days from December 31, 2002." The mere inclusion of the provision that payment "will be made within 90 days of December 31, 2002"does not lead this Court to the conclusion that Ingersoll-Rand intended the plan to expire on that date.

On the other hand, the plain language of the SIP is clear that the plan was in effect until Dresser-Rand was sold. The sentence includes no qualifications that would lead a reasonable reader to believe that the plan would terminate or expire at any time prior to the date upon which Dresser-Rand was sold.

The payments section also clearly states that "[a]ny award under this plan will be paid no later than 90 days following the closing date of the sale of Dresser-Rand Company." Like the effective date language, the payment is conditioned only on the closing sale date. There is no qualifying language that restricts the plan payments to sale of the company on or before December 31, 2002.

Other sections of the SIP also support the reading that the plan was in effect until Dresser-Rand was sold. "This plan is in lieu of any grant . . . for the years 2001, 2002, 2003" and "[a] grant will be made in January 2001 for the years 2001, 2002 and 2003" (underscoring added for emphasis).

Clearly, the plan provides that SVUs will be issued for calendar year 2003 to reward key employees for their efforts in maximizing a desirable sale price.  Had the plan expired in December 2002, as Ingersoll-Rand asserts, there would be no need to issue awards to employees for calendar year 2003.

Ingersoll-Rand has not provided credible evidence that it notified the affected employees in advance that the SIP was withdrawn, modified, or terminated.  In fact, the 2003 e-mails to some of the Antoun plaintiffs from high level corporate officers, such as Dresser-Rand president Vince Volpe, stating that SVUs will not be paid unless and until Dresser-Rand is sold, are persuasive evidence that the plan was viable beyond 2002.  These corporate officers, through these e-mail exchanges, had numerous opportunities to advise Antoun and others that the plan no longer existed, but they did not do so.  Instead, the e-mails repeatedly reinforce the concept  that no payment of the SVUs will be made unless Dresser-Rand is sold.

Also persuasive is the fact that the severance agreements of other employees, contemporaneous with those signed by the Antoun plaintiffs, do contain language concerning the disposition of their SVUs.  In addition, the 2004 sale incentive program contains no language that says that it replaces or extinguishes the 2000 sale incentive program.  Therefore, Ingersoll-Rand's contention that the Antoun plaintiffs knew that the 2000 plan had expired because the company launched the 2004 plan is baseless.  The Court finds no credible evidence to support that contention.

Therefore,  the Court is persuaded by the evidence that the SIP was in full force and effect at the time the Antoun plaintiffs signed their severance agreements.

**The Release Standard**

A release is a writing which manifests an intention to discharge another from an existing

duty.  <u>Model Plan Fin. Corp. v. Eagles</u>, 107 N.J.L. 452 (E. & A.1931).  Releases are binding unless there is a showing of fraud, misrepresentation or over-reaching by the releasee.  <u>Bilotti v. Accurate Forming Corp.</u>, 39 N.J. 184 (1963).

"The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and circumstances."  <u>Id.</u> at 204.  "A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands due at the time of its execution and within the contemplation of the parties."  <u>Id.</u> (citations omitted).

Questions of such intent cannot ordinarily be fairly disposed of on affidavits in a summary judgment application.  <u>Breen v. Peck</u>, 28 N.J. 351, 355 (1958) (citations omitted).  "Claims or demands arising contemporaneously . . . are not discharged unless expressly embraced therein."  <u>Bilotti</u>, 39 N.J. at 204 (citation omitted).  "[O]ther jurisdictions . . . hold that a claim or obligation which did not pre-exist the release was not covered by it."  <u>Id.</u> (citation omitted).

Ingersoll-Rand claims that the releases in the <u>Antoun</u> plaintiffs' severance agreements apply to their SVU claims because they "(1) assert a liability allegedly owed by Ingersoll Rand; (2) related to events that occurred as of the date of the Agreement - - e.g., Ingersoll Rand's grant of SVUs years before . . . and (3) arise from the Releasing Claimants' employment with the company."

Although the releases concern a liability owed by Ingersoll-Rand and arise from the <u>Antoun</u> plaintiffs' employment, the Court is unpersuaded that the releases relate to events that occurred as of the date of the Agreement.  The e-mails show that, at a minimum, four of the <u>Antoun</u> plaintiffs expected to be paid the SVUs upon the sale of Dresser-Rand.  This Court finds most persuasive, however, that those who were charged with negotiating the severance agreements with the <u>Antoun</u>

30

plaintiffs, Vince Volpe, Adam Nightingale, and Robert Haffner, were under the impression that the SIP was still viable and the SVUs would be paid when Dresser-Rand was sold.  Volpe, Nightingale, and Haffner did not tell the <u>Antoun</u> plaintiffs that the SVUs would not be paid.  Quite to the contrary, they made statements to the effect that the <u>Antoun</u> plaintiffs would be treated the same as everyone else, that the SVUs were "ever green," and that the SVUs would be paid when the company was sold and not before.

Therefore, considered in the light of all the facts and circumstances, the Court concludes there is no evidence to support a finding that either the <u>Antoun</u> plaintiffs or the company representatives who negotiated the severance agreements intended the releases to cover the SVU payments under the SIP.

A release ordinarily covers only claims and demands due at the time of its execution, unless the claim or demand is specifically named.  Although Antoun tried to get his SVUs paid in advance of the sale of Dresser-Rand, he was rebuffed by Volpe with the admonition that they would not be paid until the company was sold.  Therefore, it is clear that the SVUs were not due at the time of execution of the agreements because the sale of Dresser-Rand had not yet occurred.  This is further evidence that the scope of the releases did not contemplate the inclusion of the SVUs.  Additionally, the releases in the severance agreements of the nine <u>Antoun</u> plaintiffs do not specifically name the SIP or the SVU payment due under the SIP.  The Court, therefore, concludes that the evidence supports the <u>Antoun</u> plaintiffs' assertion that the SVUs were not within the contemplation of the parties at the time the releases were negotiated and executed, and the SIP and the SVUs are not covered by the releases signed.

31

**The Doctrine of Accord and Satisfaction**

> A consideration is necessary to render an accord and satisfaction valid. . . . There must be some advantage, or presumed or assumed advantage, accruing to the party who yields his claim, or some detriment to the other party. To constitute a valid accord and satisfaction, it is essential that the debtor shall have offered what was given and that the creditor shall have accepted it with the intention it should operate as a satisfaction.

See Decker v. George W. Smith & Co., 88 N.J.L. 630 (E. & A.1916) (citations omitted).

The doctrine of accord and satisfaction embodies a type of release agreement which "requires the parties to mutually intend the subsequent agreement to satisfy the prior obligation." Pan Am. World Airlines, Inc. v. Midlantic Nat. Bank/North 1990 WL 61784, *4 (D.N.J. 1990) (citation omitted).

As noted above in the discussion about the releases, the Court concludes that mutuality of intent required to satisfy the doctrine of accord and satisfaction is missing here in that none of the parties to the negotiations of the severance agreements of the Antoun plaintiffs intended the releases to cover payment of the SVUs under the SIP.

**The Summary Judgment Standard**

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met this burden, the burden then shifts to the non-moving party. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

32

the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, the non-moving party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Rather, he must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The facts asserted by the party opposing the motion, however, if supported by affidavits or other evidentiary material, must be regarded as true. Janek v. Celebrezze, 336 F.2d 828 (3d Cir. 1964).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. at 247. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the non-moving party. Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

Ingersoll-Rand's motion for partial summary judgment dismissing the Antoun plaintiffs' complaint is denied. As discussed above, the Court concludes that the evidence supports the contention that the SIP was viable at the time the Antoun plaintiffs' signed their severance agreements. The SIP clearly states that the plan was effective until Dresser-Rand was sold and other sections of the plan document support the contention that the plan was viable beyond December 31, 2002. Because Ingersoll-Rand's notice to the SIP participants was sent after Dresser-Rand was sold, it is clearly inadequate to support Ingersoll-Rand's assertion that the plan had expired. Additionally, Ingersoll-Rand's assertion that the Antoun plaintiffs were aware that the company was not sold by

33

December 31, 2002 is undisputed, but irrelevant, as is the fact that Ingersoll-Rand launched a new SIP in 2004.

Based on the representations of the parties who were responsible for negotiating the severance agreements with the <u>Antoun</u> plaintiffs, and there being no credible contrary evidence, the Court finds that no release of rights, either general or specific, under the SIP was contemplated or included at the time the signatories signed the releases.

Therefore, the <u>Antoun</u> plaintiffs' motion for partial summary judgment dismissing the Second and Third Separate Defenses in the Answer of Ingersoll-Rand to the complaint is granted. The Court finds for the reasons cited above that the SIP was viable and the <u>Antoun</u> plaintiffs' claims are not barred either by the releases they signed or the doctrine of accord and satisfaction.

## III.  CONCLUSION

Ingersoll-Rand's motion for partial summary judgment, to dismiss the claims of the <u>Antoun</u> plaintiffs, is DENIED.  The <u>Antoun</u> plaintiffs' motion for partial summary judgment, dismissing Ingersoll-Rand's Second and Third Affirmative Defenses, is GRANTED.  An appropriate order follows.

/s/ Dickinson R. Debevoise
Dickinson R. Debevoise, U.S.S.D.J.

Dated: October 26, 2006

34